# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **TRINA A. WIREMAN,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:05cv00046 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

*I. Background and Standard of Review*

Plaintiff, Trina A. Wireman, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2003 & Supp. 2006). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings

of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Wireman protectively filed her application for SSI on or about September 23, 2002, alleging disability as of September 28, 2001, based on fibromyalgia, fatigue, disc removal from her neck, depression, lower back, neck and arm pain. (Record, ("R."), at 63-66, 72, 108.) Wireman's claim was denied both initially and on reconsideration. (R. at 42-44, 49, 50-52.) Wireman then requested a hearing before an administrative law judge, ("ALJ"). (R. at 53.) The ALJ held two hearings on November 6, 2003, and March 10, 2004, at which Wireman was represented by counsel. (R. at 28-39, 398-414.)

By decision dated March 25, 2004, the ALJ denied Wireman's claim. (R. at 13-22.) The ALJ found that Wireman had not engaged in substantial gainful activity since September 28, 2001. (R. at 21.) The ALJ found that the medical evidence established that Wireman had severe impairments, namely history of cervical discectomy and fusion, fibromyalgia, diabetes mellitus and a depressive disorder, but he found that Wireman did not have an impairment or combination of impairments

listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18, 21.) The ALJ further found that Wireman's allegations regarding her limitations were not totally credible. (R. at 21.) The ALJ found that Wireman had the residual functional capacity to perform light work[1] that did not require climbing of ladders or scaffolds, no repetitive overhead reaching and no rotating shifts. (R. at 21.) The ALJ also found that Wireman was seriously limited, but not precluded, in her ability to deal with work stresses and the public and that she had a satisfactory ability to relate to co-workers, to interact with supervisors and to maintain attention and concentration. (R. at 21.) The ALJ found that Wireman could not perform any of her past relevant work. (R. at 21.) Based on Wireman's age, education and work experience and the testimony of a vocational expert, the ALJ concluded that Wireman could perform jobs existing in significant numbers in the national economy, including those of a hand packer, a cleaner, a sorter, an inventory clerk, an assembler, a general laborer, an inspector and a food service worker. (R. at 21-22.) Therefore, the ALJ found that Wireman was not under a disability as defined in the Act, and that she was not eligible for SSI benefits. (R. at 22.) *See* 20 C.F.R. § 416.920(g) (2006).

After the ALJ issued his opinion, Wireman pursued her administrative appeals, but the Appeals Council denied her request for review. (R. at 6-9.) Wireman then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2006). The case is before this court on Wireman's motion for summary judgment filed March 2, 2006,

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2006).

-3-

and the Commissioner's motion for summary judgment filed June 5, 2006.

## *II. Facts*

Wireman was born in 1965, (R. at 63), which classifies her as a "younger person" under 20 C.F.R. § 416.963(c). Wireman obtained her general equivalency development, ("GED"), diploma, and has past relevant work experience as a hairdresser, a manager and a sewing machine operator.[2] (R. at 73, 78, 401.) Wireman testified at her November 6, 2003, hearing that she experienced four panic attacks per week. (R. at 408.)

Dr. Theron Blickenstaff, M.D., a medical expert, testified at Wireman's hearing. (R. at 31-34.) Dr. Blickenstaff stated that he had reviewed all of the exhibits contained in Wireman's file. (R. at 31.) He stated that he did not believe that Wireman met or equaled a listed impairment. (R. at 31.) He recommended that Wireman not work rotating shifts because it could be difficult to regulate her diabetes. (R. at 31.) Dr. Blickenstaff also testified that Wireman's musculoskeletal problems would restrict her to occasionally lifting items weighing up to 20 pounds and frequently lifting items weighing up to 10 pounds. (R. at 31.) He stated that Wireman should not climb ladders, ropes or scaffolds or do overhead work. (R. at 31-32.)

Donna Bardsley, a vocational expert, also was present and testified at Wireman's hearing. (R. at 34-38.) Bardsley was asked to consider a hypothetical

---

[2]Wireman testified that she also had taken some college classes, but did not obtain a certificate or a degree. (R. at 401.)

-4-

individual of Wireman's age, education and work experience, who could perform light work that did not require rotating shifts and that did not require her to climb ladders, ropes or scaffolds or perform repetitive overhead work. (R. at 34.) The individual's ability to deal with work stresses and the public would be seriously limited, but not precluded and she would have a satisfactory ability to relate to co-workers, to interact with supervisors and to maintain attention and concentration. (R. at 35.) Bardsley testified such an individual could perform jobs existing in significant numbers in the national economy, including those of a hand packer, a sorter, an assembler, an inspector, food service related occupations, a cleaner, an inventory clerk and some general laborer positions. (R. at 35.) Bardsley was then asked to assume the same facts as the first hypothetical plus the restrictions assessed by Dr. Elizabeth Cooperstein. (R. at 37, 357-62.) Bardsley testified that there would be no jobs available for such an individual. (R. at 38.) Bardsley was then asked to assume the same facts as the first hypothetical plus the restrictions assessed by psychologist Robert S. Spangler. (R. at 38, 293-97.) Bardsley testified that there would be no jobs available for such an individual. (R. at 38.)

In rendering his decision, the ALJ reviewed records from Wise County Public Schools; Medical Associates of Southwest Virginia; Dr. David K. Garriott, M.D., a neurologist; Wellmont Lonesome Pine Hospital; Wellmont Holston Valley Medical Center; Dr. Matthew D. Beasey, M.D.; Dr. Ken W. Smith, M.D.; Dr. Frank M. Johnson, M.D., a state agency physician; Dr. S. C. Kotay, M.D.; Eugenie Hamilton, Ph.D., a state agency psychologist; Dr. Gary Parrish, M.D., a state agency physician; Robert S. Spangler, a licensed psychologist; Appalachian Regional Healthcare, Inc.; St. Mary's Family Center; Dr. R. Michael Moore, M.D.; and Dr. Randall E. Pitone,

M.D., a psychiatrist.

The record shows that Dr. R. Michael Moore, M.D., treated Wireman from November 1985 through June 1998 for various complaints including anxiety, depression, noninsulin dependent diabetes mellitus and chronic back pain. (R. at 337-356.)

Wireman was admitted to Appalachian Regional Healthcare, Inc., on May 13, 1997, for a drug overdose. (R. at 302-06.) She reported that she had been depressed and did not feel like living any more. (R. at 302.) Medication was started, and Wireman showed significant improvement in her depressive symptoms. (R. at 302.) She was discharged on May 20, 1997, with a diagnosis of major depression, moderate, single episode. (R. at 303.)

Wireman was seen at Medical Associates of Southwest Virginia from October 2000 through January 2004 for various complaints including diabetes, depression and joint pain. (R. at 124-83.) In October 2000, Wireman complained of depression, panic attacks and intermittent joint pain. (R. at 155-56.) In November 2000, Wireman reported that her medication helped with her aches and pains. (R. at 153.) She reported that she did not start her antidepressant medication because she began feeling better and did not believe she needed it. (R. at 153.) On January 4, 2001, Wireman reported that her anxiety and depression were doing well. (R. at 152.) On January 30, 2001, Wireman complained of "nerves and depression." (R. at 151.) She was referred for counseling. (R. at 151.) On September 20, 2001, Wireman was diagnosed with joint pain, myalgias and diabetes mellitus. (R. at 145.) On October 3, 2001, Wireman was

seen for follow-up after being discharged for a suicide attempt. (R. at 143.) On October 17, 2001, Wireman reported that she was participating in counseling and that it was "going very well." (R. at 142.) On November 14, 2001, Wireman reported excruciating pain in her neck and right shoulder and arm. (R. at 138.) She was diagnosed with cervical spine tenderness and radiculopathy. (R. at 138.) On November 30, 2001, an MRI of Wireman's cervical spine showed a moderate herniated disc at the C5-6 disc level. (R. at 186.) An MRI of Wireman's right shoulder was normal. (R. at 186.)

On March 20, 2002, Wireman complained of a lot of fibromyalgia-related pain and depression. (R. at 133.) On September 25, 2002, Wireman complained of extreme fatigue, low back pain and leg, knee and ankle pain. (R. at 131.) On October 9, 2002, Wireman reported that Wellbutrin was helping with her depression. (R. at 130.) She stated that she helped with meals at her church two days a week. (R. at 130.) On January 13, 2003, Wireman complained of wrist pain and numbness. (R. at 127.) She also reported anxiety. (R. at 127.) On February 12, 2003, Wireman's diabetes was under good control. (R. at 126.) On October 15, 2003, Wireman reported that she was still having problems with anxiety and depression. (R. at 328.)

On November 6, 2003, Dr. Elizabeth Cooperstein, M.D., and Karen Stallard, F.N.P., completed a mental assessment indicating that Wireman had a satisfactory ability to interact with the public, to interact with supervisors and to interact with co-workers. (R. at 357-58.) They reported that Wireman had a seriously limited, but not precluded, ability to understand, remember and carry out simple instructions, to make judgment on simple work-related decisions and to respond appropriately to changes

in a routine work setting. (R. at 357-58.) They also indicated that Wireman had no useful ability to understand, remember and carry out detailed instructions and to respond appropriately to work pressures. (R. at 357-58.) They also reported that Wireman could not manage benefits on her own behalf. (R. at 358.)

Dr. Cooperstein and Stallard completed a physical assessment indicating that Wireman could occasionally lift and carry items weighing up to 10 pounds and frequently lift and carry items weighing less than 10 pounds. (R. at 359-62.) They indicated that Wireman could stand and/or walk up to two hours in an eight-hour workday. (R. at 359.) They reported that Wireman could sit less than six hours in an eight-hour workday. (R. at 360.) They indicated that Wireman's ability to push and pull was limited in both the upper and lower extremities. (R. at 360.) They further indicated that Wireman could occasionally climb, balance, kneel, crouch, crawl and stoop. (R. at 360.) They found that her ability to speak was limited due to difficulty concentrating and slow reaction. (R. at 361.) Finally, they concluded that Wireman could not work around temperature extremes, noise, vibration and hazards. (R. at 362.)

On September 28, 2001, Wireman was admitted to Wellmont Lonesome Pine Hospital for an attempted overdose with suicidal ideation. (R. at 189-202.) She reported that she was frustrated at work and frustrated with pain. (R. at 189.) During her stay, her diabetes was controlled with diet. (R. at 189.) She was discharged on September 30, 2001. (R. at 189.)

On October 2, 2001, Dr. Michael W. Bible, M.D., evaluated Wireman for her complaints of pain in her knees, ankles, hip, back, elbows, shoulders and legs. (R. at

207-08.) Dr. Bible reported that Wireman had good muscle strength in both her upper and lower extremities. (R. at 208.) She had good range of motion of her shoulders. (R. at 208.) Dr. Bible reported that Wireman had numerous trigger points in the trapezius, distal humerus, distal femur, fibula and paraspinal region. (R. at 208.) He diagnosed fibromyalgia syndrome and bursitis in her knees. (R. at 207.) He recommended regular consistent exercise. (R. at 207.)

On October 3, 2001, Wireman was seen at St. Mary's Family Center for counseling following a suicide attempt. (R. at 317-27.) Wireman reported that she was in constant pain and suffered from severe fatigue. (R. at 319.) Although the notes make no mention of Wireman reporting that she suffered from panic attacks, she was diagnosed with panic attack and major depression. (R. at 326.)

On December 7, 2001, Dr. Ken W. Smith, M.D., saw Wireman for her complaints of cervical pain and right upper extremity pain, tingling and numbness. (R. at 223-25, 229.) Dr. Smith diagnosed cervical herniated nucleus pulposus without myelopathy, cervical radiculopathy at the right C-6 level of the spine and depression. (R. at 224.) He reported that Wireman could lift items weighing up to 30 pounds. (R. at 225.) On February 12, 2002, Wireman underwent an anterior cervical discectomy and fusion at the C5-C6 disc space. (R. at 243-48.) On February 19, 2002, Wireman complained of some interscapular discomfort. (R. at 219.) On March 7, 2002, Wireman complained of some mild interscapular pain that was improving daily. (R. at 217.) Wireman demonstrated an adequate attention span and ability to concentrate. (R. at 217.) On July 19, 2002, Wireman had full motor strength in both her upper and lower extremities. (R. at 215.) Dr. Smith reported that Wireman could return to work

as a production laborer. (R. at 216.)

On December 10, 2001, Dr. Matthew D. Beasey, M.D., saw Wireman for an endocrine consultation. (R. at 205-06.) Wireman had normal muscle strength and reflexes. (R. at 206.) She reported that her depression and anxiety were better with a recent change in her medication. (R. at 206.)

On December 14, 2001, an electromyogram, ("EMG"), and nerve conduction study showed mild right C5-C6 radiculopathy and a very minimal median nerve compression at the right wrist. (R. at 241-42.)

On January 22, 2003, Dr. Frank M. Johnson, M.D., a state agency physician, indicated that Wireman had the residual functional capacity to perform light work. (R. at 255-62.) He indicated that she was limited in her ability to push and pull with her upper extremities. (R. at 256.) He found no postural, manipulative, visual, communicative or environmental limitations. (R. at 257-59.)

On March 3, 2003, Dr. S. C. Kotay, M.D., saw Wireman for her complaints of knee pain. (R. at 265-70.) X-rays of Wireman's knees were normal. (R. at 265.) Examination of her knees showed tenderness and mild crunching on motion but no effusion and no joint line tenderness. (R. at 266.)

On March 11, 2003, Dr. David K. Garriott, M.D., a neurologist, performed a nerve conduction study which showed bilateral compressive median nerve neuropathy of the wrists. (R. at 184-85.)

-10-

On June 9, 2003, Eugenie Hamilton, Ph.D., a state agency psychologist, indicated that Wireman suffered from a nonsevere affective disorder and anxiety-related disorder. (R. at 271-84.) Hamilton indicated that Wireman had mild restrictions of her activities of daily living and in maintaining concentration, persistence or pace. (R. at 281.) She indicated that Wireman had no difficulties in maintaining social functioning and that she had no episodes of decompensation. (R. at 281.)

On June 9, 2003, Dr. Gary Parrish, M.D., a state agency physician, indicated that Wireman had the residual functional capacity to perform light work. (R. at 285-92.) He indicated that Wireman could frequently climb ramps and stairs and occasionally balance, stoop, kneel, crouch and crawl. (R. at 288.) He also indicated that Wireman could not climb ladders, ropes or scaffolds. (R. at 288.) He found no manipulative, visual, communicative or environmental limitations. (R. at 288-90.)

On August 7, 2003, Robert S. Spangler, Ph.D., a licensed psychologist, evaluated Wireman at the request of Wireman's attorney. (R. at 293-99.) Wireman seemed socially confident, but depressed. (R. at 293.) She generally understood the instructions, but demonstrated erratic concentration secondary to depression, discomfort and possible prescription side effects. (R. at 293.) Test results were deemed invalid, underestimating her abilities due to erratic concentration, discomfort, lability and intra-test scatter. (R. at 296.) The Wechsler Adult Intelligence Scale-III, ("WAIS-III"), test was administered, and Wireman obtained a verbal IQ score of 89, a performance IQ score of 83 and a full-scale IQ score of 85. (R. at 296, 298.) Spangler reported that Wireman's school records indicated an IQ score of 120. (R. at

120, 296.) Spangler diagnosed major depressive disorder, recurrent, severe with suicidal ideations and panic disorder without agoraphobia, moderate. (R. at 296.)

Spangler completed a mental assessment indicating that Wireman had a limited but satisfactory ability to follow work rules, to use judgment and to understand, remember and carry out simple instructions. (R. at 300-01.) He indicated that Wireman had a seriously limited, but not precluded, ability to relate to co-workers, to interact with supervisors, to maintain attention/concentration, to understand, remember and carry out detailed instructions and to maintain personal appearance. (R. at 300-01.) Spangler indicated that Wireman was substantially precluded in her ability to deal with the public, to deal with work stresses, to understand, remember and carry out complex instructions and to demonstrate reliability. (R. at 300-01.) Spangler reported that Wireman had a good to fair ability to function independently and a fair to poor ability to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 300-01.)

Wireman was seen at Frontier Health on January 14, 2004, for counseling. (R. at 375.) She was diagnosed with major depressive disorder, severe. (R. at 375.) Wireman was assessed with a Global Assessment of Functioning, ("GAF"), score of 57.[3] (R. at 375.) On February 13, 2004, Wireman complained of depression, anxiety with panic attacks and chronic pain. (R. at 369-73.) Her mood was described as

---

[3]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

-12-

moderately to severely depressed and anxious. (R. at 371.) Dr. Randall E. Pitone, M.D., a psychiatrist, diagnosed major depressive disorder, recurrent, moderate to severe without psychosis or intent to harm herself, dysthymia and panic disorder with mild agoraphobia. (R. at 372.) Wireman's GAF score was assessed at 50.[4] (R. at 372.) On March 1, 2004, Wireman reported that she was doing some better. (R. at 368.) She reported that she did hear voices talking to her, but that she did not know if it was actual voices or her mind talking to her. (R. at 368.) She was diagnosed with major depressive disorder, severe. (R. at 368.) Wireman's GAF score was assessed at 60. (R. at 368.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2006).

Under this analysis, a claimant has the initial burden of showing that she is

---

[4] A GAF of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." DSM-IV at 32.

unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated March 25, 2004, the ALJ denied Wireman's claim. (R. at 13-22.) The ALJ found that the medical evidence established that Wireman had severe impairments, namely history of cervical discectomy and fusion, fibromyalgia, diabetes mellitus and a depressive disorder, but he found that Wireman did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18, 21.) The ALJ found that Wireman had the residual functional capacity to perform light work that did not require climbing of ladders or scaffolds, no repetitive overhead reaching and no rotating shifts. (R. at 21.) The ALJ also found that Wireman was seriously limited, but not precluded, in her ability to deal with work stresses and the public and that she had a satisfactory ability to relate to co-workers, to interact with supervisors and to maintain attention and concentration. (R. at 21.) The ALJ found that Wireman could not perform any of her past relevant work. (R. at 21.) Based on Wireman's age, education and work experience and the testimony of a vocational expert, the ALJ concluded that Wireman could perform jobs existing in significant numbers in the national economy. (R. at 21-22.) Therefore, the ALJ found that Wireman was not

under a disability as defined in the Act, and that she was not eligible for SSI benefits. (R. at 22.) *See* 20 C.F.R. § 416.920(g) (2006).

In her brief, Wireman argues that the ALJ erred by improperly determining her residual functional capacity. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 9-15.) Wireman argues that the ALJ erred by failing to adhere to the treating physician rule and grant controlling weight to the opinions of Dr. Cooperstein. (Plaintiff's Brief at 16-22.) Wireman also argues that the ALJ erred in finding that her condition did not meet or equal the listed impairment for disorders of the spine found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04(A). (Plaintiff's Brief at 22-25.) Wireman further argues that the ALJ erred in finding that her condition did not meet or equal the listed impairment for depression and anxiety found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04. (Plaintiff's Brief at 25-28.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Based on my review of the evidence, I find that substantial evidence exists in this record to support the ALJ's finding that Wireman's condition did not meet or equal the impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1, §1.04(A). To meet § 1.04(A), a claimant must suffer from either a herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis or vertebral fracture, resulting in compromise of a nerve root or the spinal cord with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A) (2006). Also, the regulations specifically state that the responsibility for determining whether a claimant's condition meets or equals a listed impairment rests with the Commissioner. *See* 20 C.F.R. § 416.927(e)(2) (2006).

In October 2001, Dr. Bible reported that Wireman had good muscle strength, normal sensation, good range of motion and no joint swelling or tenderness. (R. at

-16-

208.) Dr. Bible recommended conservative treatment. (R. at 208.) In December 2001, Dr. Beasey reported normal muscle strength and reflexes. (R. at 206.) In July 2002, Dr. Smith reported that Wireman could return to work as a production laborer. (R. at 216.) Thus, I find that substantial evidence exists in the record to support the ALJ's finding that Wireman's condition did not meet or equal § 1.04(A) in that the evidence supports a finding that Wireman did not suffer from any motor, sensory or reflex loss.

Wireman argues that the ALJ erred by failing to find that her depression and anxiety met the medical listings. I disagree. The qualifying criteria for the listed impairment for depression is found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04. To meet the requirements of this section, a claimant must show that she suffers from a least four of the listed symptoms of depressive syndrome, which result in at least two of the following:

1. Marked restriction of activities of daily living;
2. Marked difficulties in maintaining social functioning;
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(A)(1), 12.04(B) (2006). A claimant also may meet the requirements of this section if she has a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than minimal limitation of ability to do basic work activities and that has resulted in either repeated episodes of decompensation, each of extended duration, or a residual disease process that has resulted in such marginal adjustment that even a

minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate or a current history of one or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C) (2006). This record contains no evidence that Wireman's condition met this listing. In fact, the health care providers who expressed an opinion on the issue, Dr. Theron and Hamilton stated that Wireman did not meet the requirements of this listing. Although the record reflects that Wireman had some problems with anxiety and depression, these conditions appear to be reasonably controlled with medications. (R. at 130, 206, 302.) The record shows that in 2001, following a medication overdose, Wireman refused follow-up treatment with a counselor, and reported that her depression was doing better as her treatment consisted only of medications. (R.139-40, 143.) Although Wireman complained of depression in March 2002, she also admitted that she had not properly taken her medication. (R. at 133.) In October 2002, Wireman reported that medication was helpful in controlling her depressive symptoms, and in November 2002 she confirmed that her depression was "pretty good." (R. at 129-30.) Even after obtaining treatment from a mental health professional in March 2004, Wireman maintained a GAF score of 60. (R. at 368.) It is well-settled that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Therefore, I find that substantial evidence supports the ALJ's finding that Wireman's condition did not meet or equal § 12.04.

I also find that substantial evidence exists to support the ALJ's finding that Wireman had the residual functional capacity to perform light work with no climbing

of ladders or scaffolds, no repetitive overhead reaching and no rotating shifts as well as a seriously limited, but not precluded, ability to deal with work stresses and the public and a satisfactory ability to relate to co-workers, to interact with supervisors and to maintain attention/concentration. Wireman contends that the ALJ erred by failing to adhere to the treating physician rule and grant controlling weight to the opinions of Dr. Cooperstein. (Plaintiff's Brief at 16-22.) For the following reasons, I find this argument unpersuasive.

The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 416.927(d) (2006). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

It should be noted that it appears from the record that Wireman did not receive any treatment from Dr. Cooperstein. Also, the ALJ found that the limitations set forth by Dr. Cooperstein and Stallard were based primarily on Wireman's subjective complaints and not on objective findings. (R. at 18.) Stallard's treatment notes indicate that Stallard recorded Wireman's complaints and adjusted her medications. (R. at 127-

-19-

Case 2:05-cv-00046-PMS   Document 22   Filed 09/05/06   Page 19 of 20   Pageid#: 134

56, 328-32, 377-79.) I further note that pursuant to the regulations, a nurse practitioner is not an acceptable medical source who can provide evidence to establish an impairment. *See* 20 C.F.R. § 416.913(a) (2006). Similarly, Spangler's assessment was rejected because it was not consistent with the medical evidence of record. (R. at 19.) Based on my review of Spangler's report, it appears that his assessment is not consistent with his own narrative report. Spangler opined that Wireman had no useful ability to interact with the public, however, in his report he indicated that Wireman's social skills were adequate and that she related well. (R. at 295.) He also described Wireman as socially confident. (R. at 293.)

The ALJ relied upon the testimony of the medical expert and on the opinions of the state agency physicians to determine Wireman's residual functional capacity. Based on this, I find that substantial evidence exists to support the ALJ's finding with regard to Wireman's residual functional capacity.

### III. Conclusion

For the foregoing reasons, Wireman's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be granted and the Commissioner's decision denying benefits will be affirmed.

An appropriate order will be entered.

DATED: This 5th day of September 2006.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE